UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BRENDA G. MARTIN, et al.,

        Plaintiffs,

   v.

METROPOLITAN LIFE INSURANCE
COMPANY,

        Defendant.

Case No.  16-cv-00484-RS

**ORDER GRANTING MOTION TO DISMISS**

## I. INTRODUCTION

Plaintiffs Brenda G. Martin ("Martin") and Joseph R. Giordano ("Giordano") own life insurance policies obtained from defendant Metropolitan Life Insurance Company ("MetLife"). Plaintiffs completed, signed, and submitted an insurance application which, together with the ensuing policy, constitutes their respective insurance contracts.  One perk of the program is the option for a loan against the accumulated cash value of the policy, an opportunity plaintiffs seized about a decade after they began doing business with MetLife.  Plaintiffs eventually learned MetLife compounds interest on all policy loans, even though this practice was not disclosed on the applications plaintiffs signed to obtain life insurance.  Suspecting they'd been hoodwinked, Martin and Giordano elected to file suit.

The crux of the complaint is that MetLife violates a century-old voter initiative ("the initiative") by charging compound interest on policy loans without obtaining borrowers' written consent.  MetLife counters it is exempt from this consent requirement by virtue of a constitutional amendment placed on the books by California voters in 1934.  MetLife also maintains, in any event, it complied with the prior initiative, and submits Martin lacks standing to prosecute her claims because she does not allege she paid compound interest.

United States District Court
Northern District of California

For the reasons explained below, MetLife's motion to dismiss will be granted.  At bottom, the 1934 constitutional amendment empowers the California legislature to regulate compound interest as a form of "compensation" exempt entities "receive from a borrower in connection with any loan."  This provision conflicts with—and thus supersedes—the initiative's consent requirement, meaning exempt entities like MetLife cannot be held liable for violating the consent requirement.  Even setting that aside, MetLife complied with the initiative.  As all four of plaintiffs' claims hang on establishing a violation, they warrant dismissal without leave to amend.

## II. FACTUAL BACKGROUND[1]

Plaintiffs Martin and Giordano own whole life insurance policies issued to them by MetLife in 1992 and 1965, respectively.  Whole life insurance is a type of product known generally as "permanent" life insurance.  It accumulates cash value and pays a benefit upon the death of the insured.

MetLife's permanent life insurance allows policyholders to borrow against the accumulated cash value of the policy.  The insured either can repay the loan directly in cash or use the cash value of the policy itself for repayment.  If an insured person dies with a loan balance remaining, MetLife reduces the death benefit it pays by an amount necessary to cover the outstanding loan balance.  If the policy is cancelled before the insured's death, the "surrender value" paid to the policyholder is reduced by the amount of any outstanding loan balance.  In

---

[1] The factual background is based on the averments in the complaint, which must be taken as true for purposes of a motion to dismiss.  Additionally, MetLife requests notice be taken of (1) the California Department of Insurance Company Profile for Metropolitan Life Insurance Company, Def.'s Request for Judicial Notice ("RJN") Ex. A; (2) Martin's life insurance policy, *id.* Ex. B; and (3) Giordano's life insurance policy, *id.* Ex. C. As these documents are incorporated by reference in the complaint, and are consistent with Rule 201 of the Federal Rules of Evidence, MetLife's request will be granted.  Plaintiffs separately request notice be taken of ballot materials for Proposition 2 in 1979, Pl.'s RJN Ex. A, and ballot materials for Proposition 12 in 1934, *id.* Ex. B. As ballot materials are a proper subject for notice where they are relevant, plaintiffs' request will be granted. *See Safari Club Int'l v. Harris*, No. 2:14–CV–01856–GEB–AC, 2015 WL 1956869, at *2 (E.D. Cal. Apr. 29, 2015) (taking judicial notice of the California Ballot Pamphlet because it was publicly available to voters); *People v. Snyder*, 22 Cal. 4th 304, 309 n.5 (2000) (taking judicial notice of ballot arguments regarding statewide proposition as legislative history and aid for interpretation).

short, the loan balance, including interest, eventually is paid either by the policyholder herself, or if she dies, the subsequent beneficiary of the insurance.

Plaintiffs completed, signed, and submitted an application to obtain their respective policies, which provide (as to both plaintiffs) the application and policy together constitute the contract between the insured and the insurer.[2]  Both policies allow for a loan up to at least the accumulated cash value of the policy, and describe in detail the manner in which compound interest may accrue.[3]  Plaintiffs signed only their applications—not the policies themselves, which they subsequently received and in which MetLife explained how interest could be compounded in certain circumstances.  Giordano took out a policy loan about a decade after he first obtained insurance from MetLife.  Martin followed suit around 2001, about nine years after she first obtained insurance.

The crux of the complaint is that MetLife violates a century-old voter initiative by charging compound interest on policy loans without obtaining borrowers' written consent.  Specifically, in 1918, the voters of California saw fit to pass an initiative repealing various usury statutes and enacting new provisions.[4]  Section one of the initiative sets the default maximum rate of interest at

---

[2] Martin's policy provides "[t]he policy and riders with the application attached at issue, and any application added after issue, make up the whole contract." Def.'s RJN Ex. B.  Giordano's policy similarly provides "[t]his policy and the application, a copy of which is attached and made part of the policy, constitute the entire contract." *Id.* Ex. C.

[3] Giordano's policy provides for a loan up to the cash value plus paid up additions and dividend accumulations. The interest provision in Martin's policy provides: "Loan interest is charged daily at the rate of 8% a year, and is due at the end of each policy year.  Interest not paid within 31 days after it is due will be added to the amount of the loan.  It will be added as of the due date and will bear interest at the same rate as the rest of the loan." Def.'s RJN Ex. B at 11. The interest provision in Giordano's policy provides: "Loan interest will accrue daily at the effective rate of 5% per year . . . If interest is not paid when due or within 31 days thereafter, it will be added to the outstanding indebtedness as of the due date and will bear interest at the same rate." *Id.* Ex. C at 9.

[4] Upon enactment, the initiative's provisions were enrolled as Stats. 1919, p. lxxxiii, *see Ghirardo v. Antonioli*, 8 Cal. 4th 791, 798 n.2 (1994), though the measure officially is uncodified.  Two major legal publishers have set out the initiative as part of the California Civil Code.  Deerings designates the initiative as "Deering's Uncod. Initiative Measures & Stats., 1919-1." (1973 ed.). *Id.*  West designates the initiative as "Civil Code Sections 1916-1 through 1916-5." *Roes v. Wong*, 69 cal. App. 4th 375, 378 (1999).  This order will use the West designation.

United States District Court
Northern District of California

seven percent, but authorizes rates up to twelve percent by written contract. Cal. Civ. Code § 1916-1. Section two—the provision most pertinent here—caps the maximum interest rate at 12 percent, and provides "interest shall not be compounded, nor shall the interest thereon be construed to bear interest unless an agreement to that effect is clearly expressed in writing and signed by the party to be charged therewith." *Id.* § 1916-2. Section three authorizes a private right of action to recover treble the interest an individual has paid in violation of sections one or two of the initiative. *Id.* § 1916-3(a). Section four repeals the prior statutes regarding interest rate limitations. *Id.* § 1916-4.

In 1934, Golden State voters ratified an amendment to the California constitution modifying various parts of the 1918 initiative.[5] Four paragraphs of the newly minted Article XX, section 22 especially are pertinent. Paragraph one reduces the maximum permissible rate of interest from twelve to ten percent. Cal Const. Art. XV, § 1. Paragraph two provides "[n]o person, association, copartnership or corporation shall by charging any fee, bonus, commission, discount or other compensation" circumvent the ten percent interest rate cap. *Id.* Paragraph three provides "none of the above restrictions shall apply" to the lender classes enumerated in the amendment. *Id.* It also says "[t]he Legislature may from time to time prescribe the maximum rate per annum of, . . . or in any manner fix, regulate or limit, the fees, bonuses, commissions, discounts or other compensation which all or any of the said exempted classes of persons may charge or receive from a borrower in connection with any loan." *Id.* Paragraph four makes clear "[t]he provisions of this section shall supersede all provisions of this Constitution and laws enacted thereunder in conflict therewith." *Id.*

Article XX, section 22 was renumbered to Article XV in 1976. Three years thereafter, the voters amended it once again to its present form. The only relevant modification is the addition of the phrase "or any other class of persons authorized by statute" to the list of exempt lender classes

---

[5] In California, voter-enacted initiatives may be modified or repealed only by a vote of the people, either through subsequent initiative or adoption of a constitutional amendment. Cal. Const., Art. II, § 10.

United States District Court
Northern District of California

1    enumerated in paragraph three. *Id.* In 1981, the legislature used this authority to amend section

2    1100.1 of the Insurance Code to make insurers as a class a new category of exempt lenders.

3    MetLife has been an incorporated admitted insurer in California since 1908. It thus seizes on

4    Article XV as a basis for its exemption from the initiative's compound interest consent

5    requirement.

6          Unimpressed by that contention, plaintiffs commenced this putative class action on

7    December 17, 2015, in the Superior Court for the County of Contra Costa. MetLife was served

8    twelve days later, and a month after that, removed the case pursuant to the Class Action Fairness

9    Act, 28 U.S.C. § 1332(d). Plaintiffs bring a quartet of claims for (1) declaratory relief, 28 U.S.C.

10   § 2201, (2) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §

11   17200 *et seq.*, (3) violation of the 1918 initiative, and (4) "unjust enrichment and money had and

12   received." Compl. ¶ 1. MetLife filed this motion to dismiss on February 24, 2016. Dkt. No. 18.

### III. LEGAL STANDARD

14         A complaint must contain "a short and plain statement of the claim showing that the

15   pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations are not

16   required," a complaint must have sufficient factual allegations to "state a claim to relief that is

17   plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic v.

18   Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the pleaded factual

19   content allows the court to draw the reasonable inference that the defendant is liable for the

20   misconduct alleged." *Id.* This standard asks for "more than a sheer possibility that a defendant

21   acted unlawfully." *Id.* The determination is a context-specific task requiring the court "to draw on

22   its judicial experience and common sense." *Id.* at 679.

23         A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil

24   Procedure tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of

25   Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal under Rule 12(b)(6) may

26   be based on either the "lack of a cognizable legal theory" or on "the absence of sufficient facts

27   alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699

28

United States District Court
Northern District of California

(9th Cir. 1990).  When evaluating such a motion, the court must accept all material allegations in the complaint as true, even if doubtful, and construe them in the light most favorable to the non-moving party.  *Twombly*, 550 U.S. at 570.  "[C]onclusory allegations of law and unwarranted inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996); *see also Twombly*, 550 U.S. at 555 ("threadbare recitals of the elements of the claim for relief, supported by mere conclusory statements," are not taken as true).

## IV. DISCUSSION

All four of plaintiffs' claims stem from the allegation MetLife unlawfully charged them compound interest without a written agreement signed by the borrowers plainly providing for such conduct.  This theory of liability flows from the 1918 initiative, which bars lenders from charging compound interest "unless an agreement to that effect is clearly expressed in writing and signed by the party to be charged therewith." Cal. Civ. Code § 1916-2.  The 1934 amendment freed a host of entities from the initiative's rigid bounds, and no one disputes MetLife now falls within a class of entities who have been so freed.  The question then arises, from what obligations have these entities ultimately been released?  As the parties well recognize, this dispute hinges undeniably on that answer.

Plaintiffs stake out the position the 1934 Amendment allows the legislature to regulate exempt entities, but only as to setting the maximum rates of interest and controlling their receipt of certain fees.  The amendment thus frees exempt entities only from the initiative's maximum interest rate provisions, and not its requirement lenders obtain written consent before they charge a borrower compound interest.  MetLife, by contrast, says the amendment empowers the legislature to regulate "in any manner" charges affecting the maximum interest rate.  As compound interest is one such charge, MetLife asserts its regulation falls exclusively within the legislature's compass. To MetLife, exempt lenders wholly have been freed from the initiative's compound interest consent requirement.

The parties are not the first to mount up for this joust, and each side has thoughtful

authority for its position. *Compare Washburn v. Prudential Ins. Co. of Am.*, No. 15–cv–04009–SI, 2015 WL 7454039 (N.D. Cal. Nov. 24, 2015) (finding insurers are exempt from the compound interest provision), *with Wishnev v. Northwestern Mut. Life Ins. Co.*, No. 15–cv–03797–EMC, 2016 WL 493221 (N.D. Cal. Feb. 9, 2016) (finding insurers are not exempt).  At the end of the day, however, the text and legislative history support MetLife's proffered interpretation. Notwithstanding that conclusion, MetLife complied with the requirement even though it is free from the initiative's obligations.

### A. MetLife is Exempt from the Initiative's Compound Interest Consent Provision

To begin, the 1918 initiative—including the compound interest consent requirement— remains in force to the extent it does not conflict with the state constitution. *Ghirardo v. Antonioli*, 8 Cal. 4th 791, 798 n.2 (1994). Article XV, section 1 of the latter document, however, toils with the usury initiative.  The Supreme Court of California juxtaposed the two in 1937, and its subsequent analysis helps demarcate the lines of conflict relevant here. *See Penziner v. W. Am. Fin. Co.*, 10 Cal. 2d 160 (1937).

In *Penziner*, the court found the initiative "was not repealed" by the constitutional amendment, "at least as to the non-exempt classes of lenders." 10 Cal. 2d at 178.  To be sure, the amendment superseded any contrary provisions, but the initiative was not wholly in conflict. Taking the paragraphs in turn, the first paragraph of the amendment reduced the maximum rate of interest to ten percent, and thus superseded the initiative on that matter.  Paragraph two, however, which prohibited circumvention of the cap "by charging any fee, bonus, commission, discount or other compensation," was "similar to the first part" of the 1918 initiative, *id.* at 172, yet other parts of the initiative found "no counterpart in the constitutional amendment," *id.*  Likewise, paragraph three of the amendment—exempting certain lenders from "the above restrictions" and placing their regulation in the hands of the legislature—found no counterpart in the initiative, which addressed in paragraph three treble damages and the creation of a private right of action. *Id.* at 172–73.

Adding it up, as to non-exempt entities, *Penziner* found the treble damages remedy

United States District Court
Northern District of California

articulated in paragraph three of the initiative had not been repealed because the amendment did not conflict squarely with the initiative on that point, and there is a presumption against repeals by implication. *Id.* at 178 ("[A]t least as to the non-exempt classes of lenders (of which group defendant is a member) the Usury Law was not repealed by the adoption of the constitutional provision, and plaintiff's cause of action was not affected thereby.").  Further expounding on its view, *Penziner* said "[a]ll that the constitutional amendment does is to reduce the maximum permissible rate from 12 percent . . . ; to exempt certain enumerated classes of lenders from certain of its provisions; and to place in the legislature a certain degree of control over the fixing of charges made by the exempt groups."[6] *Id.* at 177.  "[T]he constitutional provision is supreme," the court said, "[i]n its own sphere of operation, and in so far as it establishes different rules from those found in the [initiative] . . . but that is the extent of its operation." *Id.*  *Penziner* also recognized "the placing in the hands of the Legislature the control of the charges to be made by the exempted groups is inconsistent with the [1918 initiative]," thereby suggesting exempt lenders had been freed in greater measure from the obligations articulated in the initiative. *Id.*

Roughly two decades later, the court again shed light on the scope of conflict between the amendment and the initiative.  In *Carter v. Seaboard Finance Company*, 33 Cal. 2d 564 (1949), it construed "none of the above restrictions shall apply to [exempt entities]" in paragraph three of the constitutional amendment.  The plaintiff insisted exempt entities were freed only from paragraph two, as "the above restrictions" referred only to the limiting language appearing in the paragraph immediately preceding the exemption. *Id.* at 578–79.  The upshot, said the plaintiff, is that exempt entities were constrained by the maximum interest rate in paragraph one "until the legislature sees fit to provide a different interest rate." *Id.*

Concluding to the contrary, and thus reading the exemption broadly, the court looked to "the history attending the submission of the constitutional amendment." *Id.* at 579.  It observed,

---

[6] Plaintiffs shepherd this quote to argue the legislature was given "certain," not "complete," control over exempt entities. Opp'n at 9 n.8.  As explained below, the court's subsequent analysis in *Carter* detracts from that conclusion.

United States District Court
Northern District of California

after the adoption of the initiative, "the legislature undoubtedly recognized the inadequacy, from a business and economic standpoint, of the fixed rate of 12 percent per annum . . . and likewise concluded that the initiative measure was inadequate in that it did not prevent charges in addition to the interest which might be exacted from the borrower." *Id.* at 577.  Accordingly, "the objective of the amendment was to abolish the inflexible, inadequate and unworkable provisions of the usury law and to reestablish in the legislature the power to enact laws affecting the business of lending money in th[e] state." *Id.* at 579.  Given the purpose was "to free the legislature . . . so that interest and charges more appropriate to business conditions peculiar to each of the exempted classes could be established," *id.* at 582, the court found "no good reason why the words 'above restrictions' used in the third paragraph should not apply equally to both the first and second paragraphs," *id.* at 579.  In other words, exempt classes were freed not only from the prohibition on charges circumventing the maximum interest rate (paragraph two), but also from the need to comply with that rate in the first instance (paragraph one).

*Carter* recognized the amendment empowered the legislature broadly to "prescribe the maximum rate per annum of, or provide for the supervision, or the filing of a schedule of, or in any manner fix, regulate or limit, the fees, bonuses, commissions, discounts or other compensation which all or any of the said exempted classes of persons may charge or receive from a borrower in connection with any loan." Art. XV, § 1. The court found "until the legislature exercises the power granted to it by the amendment to r[e]gulate the business of lenders in a manner appropriate to each exempted class, the class not so governed by legislation is subject to *no restriction* on interest rates *or charges*." *Carter*, 33 Cal. 2d at 582 (emphasis added).

This dispute asks if the legislature's power to regulate the interest rates and charges of exempt lenders (like MetLife) conflicts with (and supersedes) the initiative's requirement that *all* lenders get written consent before charging compound interest.  The text and legislative history outlined above compel the conclusion it does.  MetLife therefore is not subject to the compound interest consent requirement contained in the initiative.

To start, the text of the amendment permits the legislature to "in any manner fix, regulate

or limit, the fees, bonuses, commissions, discounts or other compensation" exempt entities "may charge or receive from a borrower in connection with any loan." Cal. Const. Art. XV, § 1.  The purpose of this provision, like the purpose of paragraph two, is to help the legislature "prevent lenders from circumventing the limits on interest" by imposing "charges whereby the borrower is required to pay more than the [maximum rate]." *Carter*, 33 Cal. 2d at 579.  Compound interest is a tool lenders may employ to circumvent the interest rate cap.  Thus, the legislature's authority to regulate such charges places compound interest within the legislature's ambit.

Plaintiffs' contrary position—that the legislature can set rates and control charges *other than* compound interest—isolates that tool for special treatment without justification, and accordingly is unpersuasive.  To plaintiff, the legislature can set a maximum rate of interest for an exempt industry, but is required to watch lenders exceed it with impunity by charging compound interest to those who have agreed.  The better reading is the amendment gives the legislature authority to regulate compound interest as a form of "compensation" exempt entities "receive from a borrower in connection with any loan." Cal. Const. Art. XV, § 1.  This construction gives teeth to the maximum interest rates the legislature undeniably has authority to set because it permits the legislature to regulate a charge—compound interest—that can circumvent the limits.[7]

The presumption against repeals by implication poses no barrier to this interpretation.  To overcome that presumption, "the two acts must be irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation." *Penziner*, 10 Cal. 2d at 176.  That is

---

[7] *Wishnev* is unpersuasive in finding "fees, bonuses, commissions, discounts or other compensation" can "reasonably be construed as reaching such things as loan fees and points, not compound interest." 2106 WL 493221 at *10.  *Wishnev*'s theory is "the second paragraph of Article XV makes reference to those same terms as something 'more than the interest authorized by this section.'"  That paragraph, however, plainly contemplates those charges are forms of "compensation," and thus appends to the list: "or other compensation."  It then provides no lender shall by charging alternative forms of compensation "receive from a borrower more [compensation] than the interest authorized by this section."  This makes sense given "[t]he unmistakable purpose of the second paragraph was to prevent lenders from circumventing the limits on interest established in the preceding paragraph by forbidding any charges whereby the borrower is required to pay more than the ten percent." *Carter*, 33 Cal. 2d at 579.  At bottom, like "fees, bonuses, commissions, [and] discounts," compound interest is "compensation" the legislature can regulate to prevent circumvention of its maximum interest rate limits.

precisely the case here.  The constitutional amendment gives the legislature authority to "in any manner" regulate compound interest as a form of "compensation" exempt entities "receive from a borrower in connection with any loan." Cal Const. Art. XV, § 1.   The initiative, by contrast, sets a rigid requirement for all lenders wishing to charge compound interest, and the legislature cannot touch that requirement given the initiative may be modified only by a vote of the people, either through subsequent initiative or adoption of a constitutional amendment. *See* Cal. Const., Art. II, § 10; *Carter*, 33 Cal. 2d at 579.  The presumption against repeal simply does not operate in this instance because the two provisions "cannot have concurrent operation." *Penziner*, 10 Cal. 2d at 176.

Exempting insurers from paragraph two of the initiative is also consistent with the purpose of the amendment.  As noted, "from an economic standpoint there was need for the classification of certain types of lenders differently from other lenders as to permissible rates of interest *and other charges*." *Penziner*, 10 Cal. 2d at 177–78 (emphasis added).  That's why "[i]n adopting the 1934 amendment the voters were approving a plan by which the legislature could regulate the exempted classes in accordance with their peculiar requirements." *Carter*, 33 Cal. 2d at 587.  Plaintiffs' reading would impose the compound interest consent requirement across every industry uniformly, including those that are exempt and non-exempt.  Even assuming this obligation does not amount to an intimidating burden on lenders, the one-size-fits-all approach contravenes the amendment's purpose.

The legislative history of the constitutional amendment also bolsters the conclusion the legislature's authority to regulate charges exempt classes impose supersedes the compound interest consent requirement.  The attorney general's summary of the constitutional amendment said it "[p]ermits [the] Legislature to regulate said exempted classes, prescribe their maximum interest rate per annum *and regulate their charges on loans*." *Carter*, 33 Cal. 2d at 581 (emphasis added).  The argument to the voters explained exempt classes "have distinctive and individual problems peculiar to their respective classes of business." *Id.* at 581.  It found "[t]he Usury Law attempted to cover all classes, and has failed miserably." *Id.* at 582.  The remedy, it said, was that

1    "supervisory control of all of the exempted classes would be subject to the vigilant attention of the

2    legislature." *Id.*  This led the *Carter* court to conclude "[t]he regulation of the business of [exempt

3    entities], including their interest *and charges*, is entirely within the control of the legislature."[8] *Id.*

4    at 583 (emphasis added).

5         At base, the amendment empowers the legislature to regulate compound interest as a form

6    of "compensation" exempt entities "receive from a borrower in connection with any loan."  This

7    provision conflicts with—and thus supersedes—the initiative's compound interest consent

8    requirement.  As MetLife is exempt, it simply cannot be held liable for a violation of this

9    provision of the initiative.  Because all four of plaintiffs' claims hang ultimately on that hook, they

10   warrant dismissal without leave to amend.

11        **B. MetLife Complied with the Compound Interest Consent Provision**

12        MetLife contends in the alternative it complied with the initiative because it obtained

13   Martin and Giordano's affirmative consent to its levying compound interest under appropriate

14   circumstances.  Specifically, plaintiffs signed and submitted an application to obtain their

15   respective policies, which provide the application and policy *together* constitute the contract

16   between the insured and the insurer.  True, plaintiffs signed only their applications—not the

17   policies—and it was the latter that said interest could be compounded.  MetLife insists this is no

18   problem because the Insurance Code provides the application is part of the contract where it is

19   attached to or indorsed upon the policy—as it is here. *See* Cal. Ins. Code § 10113[9]; *New England*

20   *Mut. Life Ins. Co. v. Lauffer*, 215 F. Supp. 91, 97 (S.D. Cal. 1963) ("The insurance policies with

21

22   _____

     [8] True, *Carter* centrally contemplated the restrictions on maximum interest rates, which clearly are
     within the "core of the constitutional amendments." *See Wishnev*, 2016 WL 493221 at *11.
23   Compound interest, however, is a tool lenders use to circumvent the maximum interest rates, and
     the regulation of those tools is also within the core of the amendments.

24   [9] That section provides: "Every policy of life, disability, or life and disability insurance issued . . .
25   by any insurer doing such business within this State shall contain and be deemed to constitute the
     entire contract between the parties and nothing shall be incorporated therein by reference to any
26   constitution, by-laws, rules, *application* or other writings, of either of the parties thereto or of any
     other person, *unless the same are indorsed upon or attached to the policy*." Cal. Ins. Code § 10113
27   (emphasis added).

28

United States District Court
Northern District of California

the applications attached are construed together as they constitute one contract."). In short, MetLife contends it may charge plaintiffs compound interest on their loans because "an agreement to that effect is clearly expressed in writing and signed by the party to be charged therewith." Cal. Civ. Code § 1916-2.

Plaintiffs maintain the compound interest disclosure did not appear in the insurance application, and the only piece of paper that felt the ink of their pens was the application, not the policy itself. Tellingly, plaintiffs make no argument regarding the Insurance Code provision MetLife invokes.

All told, MetLife has demonstrated adequately it complied with the compound interest consent requirement. Section 2 of the initiative mandates borrowers must agree in writing to pay compound interest. The complaint concedes MetLife's policies explicitly disclosed the compounding of interest, and plaintiffs do not challenge the adequacy of either disclosure. Plaintiffs signed only their applications, but the policies and Insurance Code provide the application is part of the contract. Accordingly, the agreement clearly disclosed the compounding of interest, and plaintiffs gave written consent to such charges.

*McConnell v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 33 Cal. 3d 816 (1983), affords plaintiffs no help. There, the lender's contract disclosed to borrowers "custom[ary]" interest would be charged, and the lender utilized parol evidence to show borrowers knew that term included compound interest. *Id.* at 818. The California Supreme Court held parol evidence could not be employed under those circumstances because the initiative required the compound interest disclosure to be clear on its face. *Id.* at 822–23. Here, the disclosure provisions appear plain on their face, and plaintiffs do not argue to the contrary. *McConnell* therefore is largely inapposite to the instant dispute.

Though not dispositive, it is worth noting plaintiffs waited a decade to take out their loans, so they were on notice for ten years that if they borrowed money from MetLife, interest would be compounded. Martin's policy, moreover, contained a "free look" period during which MetLife directed her to read the policy and return it within ten days if she would like to void the agreement.

United States District Court
Northern District of California

1    Def.'s RJN Ex. B at 1.  This is to say nothing of the fact that the policies appear to have been

2    delivered to both plaintiffs on or before the policies' actual issue dates. *See* Def.'s RJN Ex. B at 1,

3    Ex. C.  The drafters of the initiative may not explicitly have contemplated this piecemeal approach

4    to contracting, which is ubiquitous in the insurance field today.  That said, given the state of

5    insurance law, and the temporal delay present in the instant case, MetLife heeded the call for

6    lenders to obtain borrowers' prior written consent.

7         In sum, MetLife affirmatively complied with the compound interest consent requirement.

8    Its motion to dismiss all four of plaintiffs' claims accordingly will be granted.[10]

9                                    **V. CONCLUSION**

10        As MetLife is exempt, it cannot be held liable for violating the initiative.  In any event,

11   MetLife affirmatively complied with the compound interest consent requirement.  Its motion to

12   dismiss all four of plaintiffs' claims will be granted without leave to amend.

13

14   **IT IS SO ORDERED**.

15

16   Dated: April 12, 2016

17                                    _____

18                                    RICHARD SEEBORG
                                      United States District Judge

19

20

21

22

23

24

25   _____

26   [10] MetLife also argues Martin lacks standing to assert her claims for relief because the complaint
     does not allege she paid compound interest to MetLife.  This issue need not be reached in light of
27   the disposition outlined above, which stands on firm ground because Giordano's allegations are
     adequate.

28